UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
ASSOCIATED PRESS,                    :
                                     :
            Plaintiff,               :      05 Civ. 5468 (JSR)
                                     :
            -v-                      :      OPINION AND ORDER
                                     :
UNITED STATES DEPARTMENT OF DEFENSE, :
                                     :
            Defendant.               :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        This is the second chapter in the ongoing attempts of the
Associated Press ("AP") to obtain from the U.S. Department of Defense
("DOD") basic information about the people housed in the detention
facility at Guantanamo Bay, Cuba.  See Associated Press v. U.S. Dep't
of Def., 410 F. Supp. 2d 147 (S.D.N.Y. 2006) ("AP I").  As before, the
Court finds that AP is entitled to nearly all the information it seeks.

        In AP I, AP obtained, pursuant to the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552 et seq., basic identifying information about
the detainees.  AP I, 410 F. Supp. 2d at 147.  In the instant action,
AP seeks, pursuant to FOIA requests made on November 16, 2004 and
January 25, 2005: (a) documents containing allegations or accounts of
detainee mistreatment by DOD personnel, and documents identifying
resulting disciplinary action; (b) documents containing allegations or
accounts of detainee-against-detainee abuse; (c) documents containing
details and explanations of the decisions made to release or transfer
detainees from Guantanamo; and (d) certain documents relating to
hearings of the Administrative Review Boards (the "ARBs") held in

Guantanamo Bay, Cuba,[1] including transcripts of the proceedings, written statements and other documents provided by detainees, witness affidavits, and documents provided to each detainee stating the basis for his detention as an enemy combatant.[2]  See FOIA request dated 11/16/04, attached as Ex. A to Declaration of Adam Rappaport dated March 3, 2006 ("Rappaport Decl."); FOIA request dated 1/25/05, attached as Ex. B to Rappaport Decl.  In response to these requests, DOD eventually produced approximately 1400 pages of documents, but with extensive redactions.  See Hecker Decl. ¶¶ 5, 8-10.  The parties subsequently narrowed their dispute, so that only four categories of redaction remain in issue.  Now, on the parties' cross-motions for summary judgment, the Court finds that it is able to resolve these remaining disputes as a matter of law, as follows:

(a) Identifying information of detainees who allege abuse by DOD personnel. From the records of disciplinary actions taken against DOD personnel for detainee abuse, DOD has redacted, purportedly pursuant to FOIA Exemptions 6, 5 U.S.C. § 552(b)(6), and 7(c), 5 U.S.C. § 552(b)(7)(c), the names and other identifying information of the

---

[1] The ARBs conduct annual reviews of the status of each detainee designated an "enemy combatant," and make a recommendation whether a given detainee should be released, transferred to the custody of another country, or further detained.  See AP's Mem. Opp. Summ. J. at 4; Declaration of Karen L. Hecker dated February 22, 2006 ("Hecker Decl.") ¶ 3a.

[2] Prior to each detainee's ARB review, a DOD agency prepares an unclassified written summary that contains the primary factors favoring his continued detention and the primary factors favoring his release or transfer. See Hecker Decl. ¶ 3d.  Before the ARB hearing, this document is provided to the enemy combatant in his native language and in English.  Id.

detainees who made the allegations of abuse that led to the discipline. Specifically, there are eight files in which such redactions appear. See Hecker Decl. ¶ 8.

The first file concerns alleged misconduct in May 2002 involving interactions between an agitated detainee and a guard at the detention hospital. The file contains a letter reprimanding the commander of the military police battalion for failing to establish a positive leadership climate, and the investigative inquiry into the allegations that led to the discipline. The inquiry documents include statements by the subject of the investigation and military witnesses. See id. ¶ 8a.

The second file concerns an investigation into alleged misconduct in September 2002. The file contains a form reflecting the nonjudicial punishment imposed on a soldier for assault based on his attempt to spray a disruptive detainee with a water hose, and the soldier's statement concerning the incident. See id. ¶ 8b.

The third file concerns an investigation into alleged misconduct in October 2004. The file contains the nonjudicial punishment imposed on a soldier for assault after he struck a detainee on the mouth with his fist as he tried to subdue the detainee, and the investigative inquiry into the allegations that led to the discipline. The inquiry documents include statements by the subject of the investigation and military witnesses. See id. ¶ 8c.

The fourth file concerns an investigation into alleged misconduct in March 2003, in which a guard was alleged to have inappropriately used pepper spray on a detainee. The file contains a draft court-martial charge sheet for an assault charge, a nonjudicial

-3-

punishment form for the same allegation, the commander's recommendation regarding discipline, and the investigatory inquiry into the allegations that led to the discipline.  The inquiry documents include statements by the subject of the investigation and military witnesses, as well as the standard operating procedures for pepper spray.  See id. ¶ 8d.

The fifth file concerns an investigation into alleged misconduct in April 2003, in which a guard was alleged to have struck a detainee, failed to properly secure a detainee's cell, and been disrespectful to his superior officer.  The file contains the nonjudicial punishment imposed on the guard for assault, dereliction of duty and disrespect toward a commissioned officer, and the investigatory inquiry into the allegations that led to the discipline.  The inquiry documents include the findings and recommendations of the investigating officer, statements by the guard and other military witnesses, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the discipline that should be imposed.  See id. ¶ 8e.

The sixth file concerns an investigation into alleged misconduct in January 2004, in which a guard was alleged to have verbally harassed a detainee and splashed a cleansing product in his face.  The file contains the nonjudicial punishment imposed on the guard for assault and violation of a military regulation, and the investigatory inquiry into the allegations that led to this discipline.  The inquiry documents include the findings and recommendations of the investigating officer, statements by the guard and other military witnesses, the legal advice provided to the commander regarding the investigation, and the

-4-

recommendations of various commanders regarding the discipline that should be imposed. See id. ¶ 8f.

The seventh file concerns an investigation into alleged misconduct in March 2004, in which guards were alleged to have mistreated a detainee by not taking him to a restroom promptly enough. The file contains the findings and recommendations of the investigating officer, statements by the guard and other military witnesses, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the investigation. See id. ¶ 8g.

The eighth file concerns an investigation into alleged mistreatment in April 2003, in which interrogators were alleged to have mistreated a detainee during an interrogation.  The file contains a letter reprimanding the Director of the Joint Intelligence Group, the findings and recommendations of the investigating officer, statements by the interrogators and other military witnesses, medical records of the detainee, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the discipline that should be imposed. See id. ¶ 8h.

From each of these eight files, DOD has redacted the names and other identifying information of the detainees involved in the incidents in question.  In support of these redactions, the Government relies on FOIA Exemptions 6 and 7(c).  Exemption 6 exempts from disclosure those "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  These eight files here in issue are "similar

-5-

files" under the broad definition set forth by the Supreme Court in
United States Dep't of State v. Wash. Post Co., 456 U.S. 595, 601-03
(1982); see also Wood v. FBI, 432 F.3d 78, 87 n.6 (2d Cir. 2005), and
a few of the documents are actually medical records, see Hecker Decl.
¶¶ 8h, 17c. Similarly, Exemption 7(c) exempts from disclosure "records
or information compiled for law enforcement purposes, but only to the
extent that the production of such law enforcement records or
information ... could reasonably be expected to constitute an
unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7). The
records here in issue — records of investigations to determine whether
to charge U.S. military personnel with misconduct — were compiled for
law enforcement purposes, i.e., enforcing the Uniform Code of Military
Justice. Cf. Aspin v. Dep't of Def., 160 U.S. App. D.C. 231 (D.C. Cir.
1973) (holding that a Commission Report, the end product of an
investigation "primarily directed toward discovering and toward
obtaining evidence of possible offenses under the Uniform Code of
Military Justice ... with a view toward prosecution if warranted," was
an "investigatory file compiled for law enforcement purposes" within the
meaning of Exemption 7).

Exemptions 6 and 7(c) both require the Court to balance the
privacy interest and the public interest. Exemption 7(c) affords more
protection to privacy interests than Exemption 6: under Exemption 6
information may be withheld only if its disclosure "would constitute a
clearly unwarranted expectation of personal privacy" (emphasis
supplied), whereas under Exemption 7(c), information may be withheld if
it "could reasonably be expected to constitute an unwarranted invasion

-6-

of personal privacy." See Nat'l Archives & Records Admin v. Favish, 541 U.S. 157, 165-66 (2004).  On the specific facts, here, however, it is hard to see that any substantial privacy interest is involved.  This is not like the situation of, say, a whistleblower, whose anonymity is protected to avoid retaliation.  Here, the detainees' identities were fully known to both the personnel they accused and the personnel who responded to the accusations.

Moreover, as the Supreme Court re-emphasized just this past June in holding that parolees have a severely diminished expectation of privacy, prisoners have even less of a privacy right.  See Samson v. California, 126 S. Ct. 2193, 2197 (2006), citing Hudson v. Palmer, 468 U.S. 517, 530 (1984), for its "holding that prisoners have no reasonable expectation of privacy."

Hudson, to be sure, left protections for rights "not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration," id. at 523, and this has been interpreted, for example, to protect in appropriate circumstances the confidentiality of previously undisclosed medical information.  See Powell v. Schriver, 175 F.3d 107, 112 (2d Cir. 1999).  But the records here concern, almost entirely, the behavior of the agency and its employees, not that of the detainees, see Hecker Decl. ¶¶ 8a-h, and it appears that even the redacted medical records were concerned, not with the detainees' pre-existing medical conditions or treatments, but with the medical evidence vel non of the abuse they allegedly suffered, see id. ¶ 8h.  Although revelation of abuse by one's captors may cause some limited embarrassment, most people in such a situation — especially

-7-

individuals detained incommunicado without many procedural safeguards — would want their plights, and identities, publicized. Cf. Lepelletier v. FDIC, 164 F.3d 37, 46-49 (D.C. Cir. 1999) ("[A]nalysis under Exemption 6 must include consideration of any interest the individual might have in the release of the information.").  Indeed, three former detainees issued a 115-page report in 2004 alleging they were beaten and otherwise mistreated while at Guantanamo, see Glenn Frankel, Three Allege Guantanamo Abuse, Wash. Post, Aug. 5, 2004, at A12, and others have conveyed allegations of abuse to the public through their attorneys, see Josh White, Guantanamo Desperation Seen in Suicide Attempts, Wash. Post, Nov. 1, 2005, at A1.  Moreover, many current detainees have participated in hunger strikes to protest alleged abuse. See Letta Tayler, New Allegations Of Abuse, Newsday, Oct. 27, 2005, at A23.  In all such instances, the detainees have not hesitated to reveal their identities.

As these last examples illustrate, there must be weighed against the detainees' minimal privacy interest purportedly here asserted on their behalf by their captors the considerable public interest in learning more about DOD's treatment of identifiable detainees, whether they have been abused, and whether such abuse has been properly investigated.  See, e.g., Dep't of Def. v. FLRA, 510 U.S. 487, 495 (1994) (holding that the "relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government.").

The public interest in disclosing government malfeasance is well-established. "[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Favish, 541 U.S. at 174. Here, AP has certainly made such a showing. In addition to the public allegations of certain detainees described above, certain military officers and FBI agents who have worked at Guantanamo have also questioned the treatment of detainees, see, e.g., In re Guantanamo Cases, 355 F. Supp. 2d 443, 474 (D.D.C. 2005) (recounting FBI agent's allegations of detainee mistreatment); Neal A. Lewis & Eric Schmitt, Inquiry Finds Abuses at Guantanamo Bay, N.Y. Times, May 1, 2005, at A35. Here, by redacting the identities of the abused detainees, DOD has seriously interfered with the ability of the public to engage in the independent fact-finding necessary to properly evaluate the allegations of abuse and DOD's response to it. See United States DOJ v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 773 (1989).

Therefore, with respect to the records described in paragraphs 8a-g of the Hecker Declaration, the privacy interest is minimal and the public interest is great, thus compelling the Court to conclude that disclosure of this information would constitute neither a clearly unwarranted, nor an unwarranted, invasion of personal privacy.

Consequently, the redactions must be removed and the information disclosed.

(b) <u>Identifying information of detainees involved in allegations of detainee-against-detainee abuse</u>. DOD has also redacted detainee identifying information from documents concerning detainee-against-detainee abuse, again purportedly pursuant to FOIA Exemptions 6 and 7(c). These documents, maintained in the Detainee Information Management System, consist of reports of allegations of detainee-against-detainee abuse recorded by military personnel in the course of their official duties. <u>See</u> Hecker Decl. ¶ 10. Once again, these are "similar files," such that the Court must balance the privacy interest and public interest. <u>See</u> <u>Wash. Post Co.</u>, 456 U.S. at 601-03; <u>Wood</u>, 432 F.3d at 87 n.6.

Here, the privacy interests of those detainees who made allegations of abuse by fellow detainees would seem to be minimal at best, for their obvious purpose in making the allegations was to bring them to light. <u>Cf.</u> <u>Lepelletier</u>, 164 F.3d at 46-49 ("[A]nalysis under Exemption 6 must include consideration of any interest the individual might have in the release of the information."). Similarly, there is no reason to believe that any detainee who was observed being abused by another detainee would have any reason to keep his identity private. Arguably the privacy interests of the detainees about whom the allegations were made might be slightly more weighty, but, as noted above, the privacy rights of prisoners in circumstances involving prison discipline are extremely modest, <u>see</u> <u>Samson</u>, 126 S. Ct. at 2197; <u>Hudson</u>, 468 U.S. at 530, and the Government has failed to point to any case in

which the identity of a prisoner accused of abusing a fellow prisoner
has been accorded privacy protection under FOIA.  Moreover, even though
there are only a handful of detainees who fit this category, the
Government has failed to make a particularized showing of why any given
one of them has a material privacy interest in keeping his identity
secret.

In any event, any such privacy interest is substantially
outweighed by the public interest in knowing more about the context in
which DOD was called upon to evaluate the allegations, an inquiry that
can only be fully explored if one knows the particulars about the person
whose conduct is in question.  For example, without learning the names
of the detainees here involved, one cannot know their nationalities or
religion, even though much information was previously released pursuant
to AP I because it was there indexed by name of detainee.  How could an
FOIA requester meaningfully evaluate the DOD response to a case of
detainee-against-detainee abuse if he did not know the nationalities or
religions of the detainees' involved, which would necessarily provide
some of the context for the incident?  More generally, for the same
reasons that it was useful to the DOD personnel investigating these
incidents to know the identifying information of those involved, such
information is similarly useful to those who, by making an FOIA request,
seek to scrutinize DOD conduct.  Nor can this request be read in
isolation from AP's other FOIA requests.  For, given the public interest
in scrutinizing DOD treatment of the detainees generally, DOD's actions
in response to allegations of detainee-against-detainee abuse take
meaning in part from how the same detainees were treated by DOD in other

-11-

aspects of their detention, an evaluation that can only be made if the redactions here in issue are removed.

Accordingly, the redacted identifying information contained in the detainee-against-detainee abuse files must be disclosed.

(c)   Detainee identifying information in transfer-release documents.   DOD has redacted, purportedly pursuant to FOIA Exemptions 5, 5 U.S.C. § 552(b)(5), and 6, detainee identifying information from certain documents containing details and explanations of the decisions made to release or transfer detainees from Guantanamo.

By way of background, after an ARB hearing has occurred, the three officers comprising the ARB meet privately and vote to recommend whether the detainee should be released, transferred, or further detained.   The panel then submits its assessment, the record, and its recommendations (collectively, "Record of Proceedings and Basis for ARB Decision") to the Designated Civilian Official ("DCO").   See Hecker Decl. ¶ 3g-3h.   The DCO, in turn, reviews the Record of Proceedings, including the recommendation of the ARB, and then makes a decision whether to release, transfer, or continue to detain the detainee.   The DCO's decision is documented in an "action memorandum."   See id. ¶ 3h. If the DCO determines that continued detention is warranted, the enemy combatant will remain in DOD custody and a new review date will be scheduled.   See id. ¶ 3i.   If the DCO determines that a detainee should be transferred from Guantanamo, the proposal is forwarded to interested Government agencies.   See id. ¶ 3j.   DOD then undertakes a process, typically involving the United States Department of State, to determine what measures the transferee government will take to ensure that the

-12-

detainee will not pose a continuing threat to the United States, as well as to obtain assurances that the detainee will be treated humanely.  See id. ¶ 3k.  DOD has interpreted AP's FOIA request as seeking the Record of Proceedings and the action memoranda.[3]

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The traditional civil discovery privileges, including "the privilege for attorney work-product and what is sometimes called the 'deliberative process' privilege," are thereby incorporated into FOIA.  See DOI v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).

The deliberative process privilege, which DOD here invokes, serves many important purposes:

> to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980); see also Klamath, 532 U.S. at 8-9 (holding that the policy behind this privilege is "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential

---

[3] AP does not contest DOD's withholding pursuant to Exemption 5 of the recommendations of the ARB panel and the ARB legal advisor.  See Normand Decl. ¶ 5; Supp. Normand Decl. ¶ 4.

item of discovery and front page news"); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) ("The point, plainly made in the Senate Report, is that the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be the poorer as a result.") (quoting S. Rep. No. 813, p. 9).

As a result, the privilege operates to protect "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Tique v. U.S. Dep't of Justice, 312 F.3d 70, 76 (2d Cir. 2002); see also Sears, Roebuck, 421 U.S. at 150 (holding that privilege focuses on documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated").

To determine whether a given document qualifies for such privilege, courts evaluate whether the document is (1) "predecisional," i.e., "prepared in order to assist an agency decisionmaker in arriving at his decision," and (2) "deliberative," i.e., "actually . . . related to the process by which policies are formulated." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999) (internal quotations omitted). Here, DOD argues that the action memoranda, containing determinations whether to transfer, release, or continue to detain, are preliminary and predecisional because, if the DCO determines that a detainee should be transferred, only then does the Government undertake to obtain assurances from the transferee country. If the Government is unable to obtain assurances or is unsatisfied with the assurances

-14-

received, the detainee will not be transferred.  <u>See</u> Hecker Decl. ¶ j ("[C]ircumstances have arisen in the past where the DOD elected not to transfer detainees to their country of origin because of torture concerns.").

But the DCO's action memoranda do not fall within the scope of the privilege, which, like all privileges, is to be narrowly construed, <u>see</u> <u>United States v. Weissman</u>, 195 F.3d 96, 100 (2d Cir. 1999) (citing <u>Univ. of Penn. v. EEOC</u>, 493 U.S. 182, 189 (1990) ("Privileges should be narrowly construed and expansions cautiously extended.").  In any real sense, the DCO's determination is not "predecisional," because it is a final decision by the decisionmaker himself that DOD will transfer the detainee if the requisite assurances are obtained.  <u>Cf.</u> <u>Grand Cent. P'ship</u>, 166 F.3d at 482; <u>Hopkins</u>, 929 F.2d at 85; <u>Coastal States Gas Corp.</u>, 617 F.2d at 868.  The language of DOD's own regulations suggest as much: "The DCO <u>decides</u> whether to release, transfer with conditions, or continue to detain the enemy combatant" and the DCO must "notify the Secretary of Defense of <u>his decision</u>."  Implementation of ARB Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, Encl (4) at ¶ 5c-d (emphasis added), attached as Ex. 2 to Hecker Decl. The agency's analysis is final, and its decision has been made.  There is therefore no risk that the public will be misled by premature disclosure of inaccurate information: what the public will learn is that DOD has determined either not to transfer a detainee or to transfer him if adequate assurances are obtained.

Furthermore, these documents are not deliberative.  A document is deliberative if it is "indicative of the agency's thought processes,"

-15-

Local 3, Int'l Bhd. of Elec. Workers v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988), and "reflects the give-and-take of the consultative process," Coastal States Gas Corp., 617 F.2d at 866; see also Grand Cent. P'ship, 166 F.3d at 482 (holding that additional considerations include whether the document "(i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency" (internal quotations omitted)).  The action memoranda are not contemplative, deliberative, analytical documents, weighing the pros and cons of a given course of action.  Cf. Coastal States Gas Corp., 617 F.2d at 866.  They are, as they are labeled, action memoranda — policy, not opinion — the end product of the consultative process, not part of it.

There is, moreover, an even more fundamental flaw in the Government's reliance on deliberative process privilege here, because the action memoranda have in fact already been disclosed to AP, with only the detainee identifying information redacted.  See Hecker Decl. ¶ 5f.  Thus, the agency's analysis has already been substantially disclosed.

The Court therefore finds the deliberative process privilege inapplicable to the claim of redaction under Exemption 5.[4]  However, DOD

---

[4]Because of this holding, the Court need not consider whether, as a qualified privilege, the deliberative process is here overcome by a sufficient showing of competing need.  See Rodriguez v. Pataki, 280 F. Supp. 2d 89 (S.D.N.Y. 2003); United States Post Office v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 165 (E.D.N.Y. 1994).

alternatively argues that the redactions here at issue still fall within Exemption 5 because "disclosure of such information could interfere with DOD's ability to transfer wartime detainees and the United States' ability to conduct diplomatic relations," Hecker Decl. ¶ 31. It is far from clear, however, what aspect of Exemption 5 is here being invoked. It is true that, although Exemption 5 principally incorporates the traditional civil discovery privileges, it may also extend to certain other privileges, especially those expressly referenced in the legislative history of Exemption 5. See United States v. Weber Aircraft, 465 U.S. 792, 800 (1984). But here DOD fails to define the scope of the alternative privilege it purports to invoke or locate its source in any precedent whatsoever.

Moreover, DOD's own language, as quoted above, shows that DOD is here surreptitiously seeking to invoke FOIA Exemption 1 — the so-called national security exemption — under the cover of Exemption 5, even though the Government has previously disclaimed any reliance on Exemption 1 in this case.[5] The Government cannot have it both ways. See Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill, 443 U.S. 340, 355 (1979) ("We hesitate to construe Exemption 5 to incorporate a civil discovery privilege that would substantially duplicate another exemption. Given that Congress specifically recognized that certain discovery privileges were incorporated into Exemption 5, and dealt with other civil discovery privileges in exemptions other than Exemption 5,

---

[5] Exemption 1 exempts from disclosure materials that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

a claim that a privilege other than executive privilege or the attorney privilege is covered by Exemption 5 must be viewed with caution."). And even assuming (contrary to fact) that the Court were willing to countenance this attempt to shoehorn Exemption 1 into Exemption 5, DOD has offered only conclusory generalizations for its applicability, thereby failing to create an adequate record that the disclosure of this information would, in fact, compromise the Government's diplomatic relations. The documents in question are the DCO's action memoranda, they have already been disclosed with detainee identifying information redacted, and they do not discuss the Government's concerns about foreign countries.

Last, DOD, in a single paragraph of its moving papers, invokes Exemption 6, arguing that disclosure of the information could subject the detainees and their family members to harm. But even though, at the Court's instance, DOD submitted ex parte specifics as to certain of the claims it is making in the instant litigation, here it has offered nothing but conclusory speculation. As already determined in AP I, this is not enough to carry DOD's burden. See 410 F. Supp. 2d at 151.

(d) Detainee family members' identifying information. Finally, DOD has redacted, purportedly pursuant to FOIA Exemptions 3 and 6, 5 U.S.C. § 552(b)(3) and (b)(6), information identifying family members of two detainees' from correspondence sent by those family members to the detainees and then submitted by the detainees to their ARBs as part of the ARB proceedings.

Exemption 3 provides that material exempted from disclosure by other statutes is also exempt from disclosure under FOIA. Specifically,

it exempts from disclosure under FOIA "matters that are ... specifically exempted from disclosure by statute ..., provided that such statute ... establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).  To successfully invoke Exemption 3, the agency must establish that "(1) the statute invoked qualifies as an exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope."  A. Michael's Piano, Inc. v. Fed. Trade Comm'n, 18 F.3d 138, 143 (2d Cir. 1994) (citing CIA v. Sims, 471 U.S. 159, 167 (1985)).

DOD argues, and AP does not contest, that 10 U.S.C. § 130c is a withholding statute within the meaning of Exemption 3.  Section 130c provides that "the national security official concerned ... may withhold from public disclosure otherwise required by law sensitive information of foreign governments in accordance with this section" if the following requirements are satisfied:

> (B)     Information eligible for Exemption. – For the purposes of this section, information is sensitive information of a foreign government only if the national security official concerned makes each of the following determinations with respect to the information:
>
> (1)   That the information was provided by, otherwise made available by, or produced in cooperation with, a foreign government or international organization.
>
> (2)   That the foreign government or international organization is withholding the information from public disclosure (relying for that determination on the written representation of the foreign government or international organization to that effect).
>
> (3)   That any of the following conditions are met:
> (A)   The foreign government or international organization requests, in writing, that the information be withheld.

(B)   The information was provided or made available to the United States Government on the condition that it not be released to the public.

(C)   The information is an item of information, or is in a category of information, that the national security official concerned has specified in regulations prescribed under subsection [(g)] as being information the release of which would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future.

Section 130c thus satisfies Exemption 3's requirement in that it "establishes particular criteria for withholding," 5 U.S.C. § 552(b)(3), and accordingly constitutes a withholding statute.

Following DOD's production to AP on March 3, 2006, pursuant to this Court's Order in AP I, of the Combatant Status Review Tribunal documents, which production included personal correspondence transmitted between detainees and their family members by the International Committee of the Red Cross ("ICRC"), known as "Red Cross Messages," the ICRC formally requested that DOD refrain from publicly releasing such documents in the future.  See Supp. Hecker Decl. ¶ 4 & Ex. A. Subsequently, Deputy Secretary of Defense Gordon England made a determination that the Red Cross Messages that DOD withheld from production in this case satisfy all the criteria of 10 U.S.C. § 130c. See Supp. Hecker Decl. Ex. B.  It is on this basis that the Government now argues that this final category of redactions is warranted under Exemption 3.

It is true that an agency's invocation of Exemption 3 may, under certain circumstances, compel a more deferential review, see Aronson v. IRS, 973 F.2d 962, 965 (1st Cir. 1992) ("[O]rdinary, deferential

principles of administrative law, not the FOIA's special, de novo
principles, govern review of the IRS's interpretation of this Exemption
3 [withholding] statute and its application to the data at issue."); but
see Landmark Legal Found. v. IRS, 347 U.S. App. D.C. 370 (D.C. Cir.
2001).   However, even under the more deferential standard, DOD's
determination cannot be justified, for the documents simply do not
"arguably" or "logically" fall within the scope of § 130c, see Aronson,
973 F.2d at 967.   The language of that section, which exempts from
production information "provided by, otherwise made available by, or
produced in cooperation with" the ICRC, 10 U.S.C. § 130c(B)(1), was
plainly intended to protect sensitive information provided by a foreign
government or international organization to the U.S. Government, the
disclosure of which would harm interests of the foreign government or
international organization.  Here, by contrast, the Red Cross delivered
these documents directly to the detainees (after allowing DOD a review
to ensure that classified or other inappropriate information is not
transmitted), see Hecker Decl. ¶¶ 7-8, and it was the detainees — not
the Red Cross — who provided them to the Government (and thereby made
them subject to a FOIA request).  See id. ¶¶ 3e, 5c, 15b(1), 15b(2).[6]
Furthermore, the ICRC is only vicariously invoking the detainees'
interests, and not its own organizational interest in confidentially
communicating with the U.S. Government (which would be the sort of

_____

[6] In this regard, the Court further notes that the ICRC does
not oppose disclosure of Red Cross letters when "the concerned
internees have freely expressed their consent to the public release
of Red Cross Messages sent or received by them."  Supp Hecker
Decl., Ex. B.

interest the statute protects).  Under these circumstances, Section 130c simply does not apply, and therefore neither does Exemption 3.

Exemption 6, however, is a closer call.  That Exemption requires the Court to "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny," United States Dep't of State v. Ray, 502 U.S. 164, 175 (1991) (internal quotations omitted), compelling disclosure of the correspondence unless doing so "would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. 552(b)(6).  The Court previously determined in AP I that, as a general matter, "third parties had even less of an expectation [than the detainees] that the information disclosed by the detainees during the tribunal proceedings would be kept confidential," 410 F. Supp. 2d at 150 (quoting Smith v. Maryland, 442 U.S. 735, 743-44 (1979) ("a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.")).  However, the Court invited DOD "to make a particularized showing that one or more specific detainees had retained a reasonable expectation of privacy with respect to one or more specific items of their identifying information sufficient to cause the Court to undertake a balancing of interests as to those particular items." AP I, 410 F. Supp. 2d at 152; see also id. at 151 n.3.  Although in AP I DOD expressly declined to submit such specifics when invited to do so by the Court, in the instant situation DOD has presented the Court with somewhat more particularized evidence as to the situation of the family members here in issue.

Specifically, as to the family members who wrote the letters submitted by the detainee known as "Detainee (b)(1)," the Government

argues that since the detainee testified at his ARB that he only worked for the Taliban (as a driver) because he needed money for medical treatment, this testimony might be perceived as suggesting disloyalty to the Taliban warranting retaliation against his family members.  See Hecker Decl. ¶ 15b(1) & Ex. 6.  But a careful reading of the ARB transcript shows that at no point did the detainee provide any intelligence or other helpful information about the Taliban to the ARB; rather, the gist of his testimony was simply to argue that his involvement with the Taliban was at a much lower level than charged. See Hecker Decl. Ex. 6.  It is difficult to see how any of this would invite retaliation against his family.  On the contrary, if, as the DOD alleged, the detainee had a higher level position in the Taliban than he claimed, his testimony would be an instance of "stonewalling" the DOD.

As to the second detainee here in issue ("Detainee b(2)"), however, the Court concludes, with some hesitation, that DOD has met its burden.  Detainee b(2) stated during his ARB, in reference to the Taliban, that "[t]hese are the people who have destroyed Afghanistan, so I despise[] these people."  He was also reluctant to share a letter from his wife, telling the tribunal that "It is a big shame in our culture to read my wife's letter for you, but now I am in a very tough situation with the letter from my wife.  Do you want it as evidence?" Hecker Decl. ¶ 15b(2) & Ex. 7.  Given all the special circumstances, the Court concludes that the wife had a reasonable expectation of privacy that was not wholly eliminated by her husband's reluctant offer of the letter to the ARB and that the competing interest of the AP in obtaining

-23-

her identity is modest. The Court concludes, in this one instance, that the Government has met its burden for redacting the wife's identifying information.

This one instance aside, AP's motion for summary judgment is hereby granted, and DOD's counter-motion denied, in all other respects. Accordingly, all redactions from all materials here in issue, save the one involving the wife of detainee b(2), must be removed, and the unredacted documents must be furnished to AP within one week of the date hereof.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         September 20, 2006